UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANKOR ENERGY, LLC ET AL.                    CIVIL ACTION

VERSUS                                                NO. 24-1953

MERIT MANAGEMENT PARTNERS            SECTION "R" (3)
I, L.P. ET AL.

## ORDER AND REASONS

Before the Court is the motion of defendants Merit Management
Partners I, L.P., Merit Energy Partners III, L.P., and Merit Energy Partners
D-III, L.P. (collectively Merit) for summary judgment on plaintiffs' claims
for decommissioning expenses;[1] the motion of plaintiffs Ankor Energy, LLC
and ANKOR E&P Holdings Corporation's (collectively ANKOR) for partial
summary judgment on defendants' liability for decommissioning expenses;[2]
and ANKOR's motion for partial summary judgment on quantum of
decommissioning expenses.[3] Each motion is opposed.[4] The Court grants in
part and denies in part ANKOR's motion for partial summary judgment on
liability, grants ANKOR's motion for partial summary judgment on quantum

---

[1]    R. Doc. 27.
[2]    R. Doc. 32.
[3]    R. Doc. 35.
[4]    R. Docs. 40, 38, 39.

of decommissioning expenses, and denies Merit's motion for summary judgment.

## I.    BACKGROUND

The Court has reviewed the record and determines the undisputed facts are as follows.  This suit arises from the decommissioning of two federal offshore oil and gas leases: South Pelto 8 (OCS F03587) and South Pelto 13 (OCS G03171).[5]  Both leases are in the Gulf of Mexico on the Outer Continental Shelf, adjacent to Louisiana.[6]  The operations on the South Pelto 8 lease were conducted under the Operating Agreement Block 8, South Pelto Area Offshore Louisiana, dated August 1, 1977 (the "PL 8 OA").[7]  The operations on the South Pelto 13 lease were conducted under the Operating Agreement Block 13, South Pelto Area Offshore Louisiana, dated July 1, 1975 (the "PL 13 OA").[8]

In 2002, Merit acquired record title and operating rights interests in the South Pelto 8 and South Pelto 13 leases.[9]  Merit later assigned its interests in the Leases to Black Elk Energy Offshore Operations, LLC ("Black Elk"),

---

[5]      R. Doc. 27-2 at ¶ 1; R. Doc. 40-2 at ¶ 1.
[6]      R. Doc. 27-2 at ¶ 2; R. Doc. 40-2 at ¶ 2.
[7]      R. Doc. 27-2 at ¶ 4; R. Doc. 40-2 at ¶ 4.
[8]      R. Doc. 27-2 at ¶ 5; R. Doc. 40-2 at ¶ 5.
[9]      R. Doc. 27-2 at ¶ 3; R. Doc. 40-2 at ¶ 3.

effective on January 1, 2011.[10]   Black Elk later assigned its interests in the Leases to Northstar Offshore Group, LLC ("Northstar"), effective as of December 31, 2014.[11]   Black Elk and Northstar have since filed for bankruptcy.[12]

On October 1, 2011, ANKOR E&P Holdings Corporation ("AEPH") acquired its interests in the Leases.[13]   ANKOR Energy LLC ("ANKOR Energy"), which was not a working interest owner in the Leases, later became the operator of the Leases.[14]  The Leases terminated in 2018.[15]  As part of its responsibilities as Operator, ANKOR Energy performed decommissioning operations.[16]   In connection with the decommissioning efforts, ANKOR incurred over $7 million in decommissioning expenses.[17]  Both Black Elk and Northstar failed to pay for the share of decommissioning expenses attributable to their interest in the Leases.[18]

On December 3, 2021, Brandt Prat, a land manager for ANKOR Energy, sent Christopher Hagge at Merit a letter by email and overnight

---

[10]    R. Doc. 1 at ¶ 6; R. Doc. 24 at ¶ 6.
[11]    *Id.*
[12]    R. Doc. 1 at ¶ 7; R. Doc. 24 at ¶ 7.
[13]    R. Doc. 27-2 at ¶ 8; R. Doc. 40-2 at ¶ 8.
[14]    R. Doc. 27-2 at ¶ 8; R. Doc. 40-2 at ¶ 8.
[15]    R. Doc. 32-5 at ¶ 10.
[16]    *Id.*
[17]    *Id.*
[18]    *Id.* at 12.

mail.[19]   The letter stated that ANKOR undertook the decommissioning obligations for the South Pelto 8 and South Pelto 13 Leases; that, due to their insolvency, Northstar and Black Elk, have not contributed; and that ANKOR sought contribution from Merit, as predecessor in interest.[20]   The letter also included the Authorizations for Expenditures ("AFEs") associated with completing the decommissioning operations, and previous correspondence from ANKOR to Merit from December 12, 2018 transmitting AFEs for abandonment operations on the leases.[21]   On July 11, 2022, Myoung Joon Kim, ANKOR Energy CFO, wrote Christopher Hagge at Merit that ANKOR had completed the decommissioning operations on the South Pelto 8 and 13 Leases and asserted that Merit was obligated to pay its proportionate share.[22] The correspondence attached invoices setting forth the costs of the operations.[23]   The invoices calculated the Merit entities' share of costs as $3,052,559.12,[24] with Merit Energy Partners D-III, L.P. responsible for

---

[19]    R. Doc. 32-8.

[20]    *Id.*

[21]    *Id.*

[22]    R. Doc. 32-9.

[23]    *Id.*

[24]    R. Doc. 35-9 at 3.

$106,839.71,[25] Merit Energy Partners III, L.P. responsible for $76,314.35,[26] and Merit Management Partners I, L.P. responsible for $2,869,405.06.[27]

On August 6, 2024, ANKOR sued Merit in this Court seeking contribution for decommissioning expenses.[28] ANKOR claims that Merit, as predecessor-in-interest to Northstar and Black Elk, remains liable for the share of decommissioning expenses attributable to the Northstar/Black Elk/Merit interests.[29] Merit now moves for summary judgment arguing that it is not liable for the expenses, as it assigned its interests to Black Elk, which later assigned those interests to Northstar.[30] ANKOR opposes[31] Merit's motion and seeks partial summary judgment on (1) Merit's liability for decommissioning expenses;[32] and (2) the quantum of decommissioning expenses.[33] Merit opposes both ANKOR motions.[34]

The Court considers the motions below.

---

[25]    *Id.* at 4, 7.
[26]    *Id.* at 5, 9.
[27]    *Id.* at 6, 8.
[28]    R. Doc. 1.
[29]    *See generally id.*
[30]    R. Doc. 27.
[31]    R. Doc. 40.
[32]    R. Doc. 32.
[33]    R. Doc. 35.
[34]    R. Docs. 38, 39.

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam). "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment." *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075 (noting that the moving party's "burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by

'unsubstantiated assertions,' or by only a 'scintilla' of evidence" (citations omitted)). "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party must put forth evidence that would "entitle it to a directed verdict if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991) (internal quotation marks omitted)). "[T]he nonmoving party can defeat the motion" by either countering with evidence sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to evidence, set out specific facts showing that a

7

genuine issue exists. *See id*. at 324. The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for resolution. *See, e.g.*, *id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

At this stage, an affirmative defense will defeat summary judgment for plaintiff "if the defendant supports each element of the defense with summary judgment evidence." *Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 117 F.4th 628, 643 (5th Cir. 2024). The burden of proof is on the party pleading the affirmative defense. *See id.*

## III.  DISCUSSION

The Leases, South Pelto Blocks 8 and 13, are located on the Outer Continental Shelf off the coast of Louisiana. Under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq*., which sets out the governing framework for this case, the Court applies the law of the state that is adjacent to the area of the Outer Continental Shelf upon which the leases are located, 43 U.S.C. § 1333(a)(1)-(2). Here, that is Louisiana law.

8

## A. Breach of Contract

ANKOR argues that Merit has breached the Operating Agreements by refusing to pay its share of the decommissioning expenses.[35]  Merit argues that it owes no decommissioning expenses because, when it assigned its interest in the Leases to Black Elk, it became a non-party to the Operating Agreements.[36]  Merit also raises various affirmative defenses, each of which this Court addresses below.[37]

Louisiana law dictates that contracts must be read in a common-sense fashion, according to the common and usual meaning of the words, to lead to logical conclusions and give effect to the parties' obvious intentions. *Lambert v. Maryland Cas. Co.*, 418 So. 2d 553, 559 (La. 1982); *see also* La. Civ. Code art. 2047 ("words of a contract must be given their generally prevailing meaning").  Under Louisiana law, the "essential elements of a breach of contract claim are the existence of a contract, the party's breach thereof, and resulting damages."  *Carollo v. Tulane Univ.*, 414 So. 3d 610, 616 (La. Ct. App. 4 Cir. 2025) (quoting *1100 South Jefferson Davis Parkway, LLC v. Williams*, 165 So. 3d 1211, 1216 (La. Ct. App. 4 Cir. 2015)).

---

[35]   R. Docs. 32, 40.
[36]   R. Docs. 27, 38.
[37]   R. Doc. 38.

*1. The Operating Agreements*

The Operating Agreements for South Pelto 8 and South Pelto 13 control here and determine whether, under their terms, Merit is liable for decommissioning. Under Louisiana law, an assignor remains solidarily liable with its assignee to a third party unless that third party releases the assignor. La. Civ. Code art. 1821; *see also Chieftain Int'l (U.S.) Inc. v. Southeast Offshore, Inc.*, 553 F.3d 817, 819 (5th Cir. 2008). Upon Merit's assignment to Black Elk, Merit's rights in the Operating Agreements were extinguished. *Lusher v. Kilcrease*, 384 So. 2d 589, 591 (La. Ct. App. 4 Cir. 1980) ("The effect of an assignment is to transfer the assignor's rights in the original agreement in favor of the assignee."); Restatement (Second) of Contracts § 317 (1981). But Merit's obligations were not extinguished unless "expressly done so by the obligee." *Bradford v. Onshore Pipeline Const. Co., Inc.*, 853 So. 2d 756, 767 (La. Ct. App. 2d Cir. 2003) (noting that defendant "is not relieved from its obligations under the gas purchase contract with [p]laintiffs just because it made an assignment to [a third party]"). The parties have presented no summary judgment evidence of a release by the obligee. At issue is thus whether the Operating Agreements themselves contain express language releasing assignors from accrued obligations upon assignment, or express language modifying the time at which

decommissioning obligations accrue, such that Merit never accrued decommissioning obligations.

Merit argues that the Operating Agreements do not contemplate continuing obligations post-assignment.[38]  In support, Merit points to *Total E&P USA, Inc. v. Marubeni Oil & Gas (USA) Inc.*, in which the Fifth Circuit interpreted the language of different Operating Agreements to determine liability for decommissioning expenses post-assignment.  824 F. App'x 197 (5th Cir. 2020).[39]  ANKOR argues that *Total E&P* in fact supports a finding that Merit's obligations were not extinguished.[40]

In *Total E&P*, the Fifth Circuit held that an assignor was not liable for decommissioning expenses post-assignment when the operating agreement explicitly stated that costs were to be shared based on interests at the time of abandonment, but that same assignor was liable for decommissioning expenses post-assignment under another operating agreement that did not contain that clear language.  *Id.*  In reaching its decision, the Fifth Circuit evaluated Articles 11.3 and 14.1 of the "CEPS Operating Agreement," and Articles 18.4 and 21.1.4 of the "MC 305 Operating Agreement."  *Id.*  Article

---

[38]    *See* R. Docs. 27, 38.
[39]    *Total E&P* was decided under Texas law.
[40]    *See* R. Doc. 32, 40.

11.3 of the CEPS Operating Agreement, which pertained to abandonment

operations, provided:

> Abandonment Operations Required by Governmental Authority. The Operator shall conduct the abandonment of the Common System as required by law and any governmental authority and the Abandonment Costs, risks and net proceeds will be shared by the Common System Owners based on the Common System Owner's Equity Interest *at the time of abandonment*.

*Id.* at 200 (emphasis added). And Article 14.1 of that agreement, which

discussed assignment of interests, provided:

> Assignment. . . . No Common System Owner assigning all or a part of its Equity Interest in the Common System is released from its obligations and liabilities created under this Agreement attributable to the period prior to the date of execution of the assignment (which obligations include liability for abandonment of the Common System, or that portion of the Common System in existence as of the date of execution of the assignment.)

*Id.*

Article 18.4 of the MC 305 Operating Agreement, which covered

abandonment operations, provided:

> Abandonment Operations Required by Governmental Authority. The Operator shall conduct the abandonment and removal of any well, Production System or Facilities required by a governmental authority, and the Costs, risks and net proceeds will be shared by the Participating Parties in such well, Production System or Facilities according to their Participating Interest Share.

*Id.* Notably, unlike its counterpart in the CEPS Operating Agreement, Article

18.4 of the MC 305 Operating Agreement did not state that "[c]osts, risks,

12

and net proceeds" will be shared based on the interest "at the time of abandonment." *Id.* Finally, Article 24.1.4 of the MC 305 Operating Agreement, pertaining to assignments, provided:

> Form of Assignments: . . . No Party assigning all or part of its Working Interest ["the record title leaseholder interest or, where applicable, the operating rights of each party in and to each lease"] is released from its obligations and liabilities created under this Agreement prior to the effective date of the Assignment.

*Id.* at 200-01.

The Fifth Circuit, after evaluating the Operating Agreements, held that Total, the previous interest holder, was jointly and severally liable for the MC 305 abandonment costs, but not the CEPS abandonment costs.

For the CEPS Agreement, the Fifth Circuit looked to the language "by the Common System Owners based on the Common System Owner's Equity Interest *at the time of abandonment*" to find that Article 11.3 limited Total's liability to zero percent. *Id.* at 205. The Court reasoned that because Total had no Equity Interest in CEPS at the time of abandonment, Total had no liability for the abandonment costs. *Id.* The Court held that Article 14.1, which "makes clear that obligations 'created under' the CEPS Agreement 'attributable to the period prior to the date of execution of the assignment' include 'liability for abandonment,'" did not change this result. *Id.* at 204-05. The Fifth Circuit reasoned that Article 14.1 did not address *when*

13

decommissioning obligations accrued, indicating that Article 11.3 of the CEPS Agreement modified the point at which decommissioning obligations accrued. *Id.* Moreover, the Fifth Circuit held that "even if the decommissioning obligations did arise before Total's assignment, Article 11.3 still limits Total's liability to its 'Equity Interest *at the time of abandonment.*'" *Id.* Thus, regardless of whether Article 11.3 operated to modify when decommissioning obligations accrued, it was clear that decommissioning obligations were to be assessed at the time of abandonment, which was after Total assigned away its interest in the lease.

For the MC 305 Agreement, the Fifth Circuit noted that, unlike the CEPS Agreement, it did not "limit an assignor's liability for abandonment costs to its ownership interest *at the time of abandonment.*" *Id.* at 205. Instead, the Agreement stated that abandonment "[c]osts, risks and net proceeds will be shared by the Participating Parties . . . according to their Participating Interest Share." *Id.* Absent language providing when abandonment obligations were created, the Court looked to 30 C.F.R. §§ 250.1701(c), 250.1702, which provide that "obligations accrue when operators, among other things, 'drill a well' or '[i]nstall a platform, pipeline, or other facility.'" *Id.* at 206 (citing 30 C.F.R. §§ 250.1701(c), 250.1702). The Fifth Circuit thus found that the obligations arose not when the government

ordered decommissioning but when the wells were drilled.  *Id.*  The Fifth Circuit concluded that, because the obligations arose prior to Total's assigning its interest, and the Operating Agreement did not extinguish those obligations, Total was liable for its share of the MC 305 abandonment costs. *Id.*

Merit argues that the South Pelto 8 and South Pelto 13 Operating Agreements are more akin to the CEPS Agreement than the MC 305 Agreement.  Specifically, Merit relies on a provision that automatically amends the percentage interests in the Operating Agreements if such interests change.  Merit asserts that its interest has been 0% since the assignment.  This argument misses the point.

The South Pelto 8 and South Pelto 13 Operating Agreements are substantially similar.  The key provisions, which are the same[41] in both agreements, are Articles IV and V.  Article IV states:

> Except as hereinafter provided, all costs and expenses incurred hereunder shall be shared, all equipment installed on the Joint Lease shall be owned, and all Oil and Gas produced and saved hereunder shall be owned by the Parties in the following percentages:
>
> [Original Parties to the Agreement and Percentage Interests Listed]
>
> Each Party shall have a "Voting Interest" equal to its Percentage Interest as shown above.  *Should the Percentage Interest change at*

---

[41] The original parties and associated percentage interests, omitted from the recitation of the Article, are not the same.

> *any time this Article IV shall automatically be amended to reflect such change.* Except as otherwise provided herein, all matters shall be decided by an affirmative vote of at least three (3) Parties jointly owning at least 51% Voting Interest; provided, however, that amendment of the Agreement shall require mutual consent of the Parties.[42]

And Article V states:

> Except as hereinafter provided, Operator shall advance, pay and discharge all costs and expenses incurred hereunder and shall charge each of the Parties the same percentage thereof as said Party's Percentage Interest stated in Article IV.[43]

Merit argues that the language "shall automatically be amended" means that upon assignment to Black Elk, Merit's percentage interest was amended to 0%, so the decommissioning costs assessed post-assignment are 0%. Merit is extrapolating too much from this language. While true that upon assignment Merit's percentage interest was amended to 0%, this would be true even absent the "shall automatically be amended" language. The language is simply a recitation of the effects of assignment and signals that the original parties and percentages explicitly listed in Article IV would change as assignments occurred. It is not an explicit release of accrued obligations. Merit's proffered reading would mean that any assignment releases the assignor of accrued obligations. This is contrary to Louisiana

---

[42]    R. Doc. 27-4 at 5-6, 98-99  (emphasis added).
[43]    R. Doc. 27-4 at 6, 99.

law, which is clear that assignment alone does not relieve the assigning party from its accrued obligations.  La. Civ. Code art. 1821; *see also Chieftain Int'l*, 553 F.3d at 819.  Without explicit language extinguishing the obligation, the Court does not find that Merit has been relieved of obligations accrued pre-assignment.

Further, the Operating Agreements do not spell out as of when abandonment costs are to be assessed, as did the CEPS Agreement.  The language the Fifth Circuit relied on in *Total E&P* to find that Total was not liable for decommissioning expenses under the CEPS Agreement was far more specific than the language here.  There, the CEPS Agreement explicitly defined a time as of which abandonment costs were to be assessed, and that time was at abandonment, which was after the assignment.  Here, the Operating Agreements are silent as to the time as of which costs are to be assessed.  Article V states only that the costs are to be assessed based on percentage interests.  Such a provision does not, on its own, release an assignor from decommissioning obligations.  *See LLOG Expl. Offshore, LLC v. Newfield Expl. & Prod. Co.*, 2016 WL 98618, at *6-7 (E.D. La. Jan. 8, 2016); *Total E&P*, 824 F. App'x at 204-06; *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W. 3d 342, 345-47 (Tex. 2006).  Nor does it modify either when obligations accrue, nor when they are assessed, as was the case

in the CEPS Agreement. Absent such specific language, this Court will not find that the Operating Agreements set a time, post-assignment for the accrual or assessment of decommissioning expenses.

As the Operating Agreements do not contain clear language modifying the time at which the decommissioning obligations accrue, nor releasing assignors of accrued obligations, the Court must determine whether Merit had decommissioning obligations pre-assignment. Absent clear language defining the accrual date of decommissioning obligations, the Court looks to the Federal Regulations for guidance. Per Federal Regulations, decommissioning obligations accrue when a party does any of the following:

> (a) Drill a well;
> (b) Install a platform, pipeline, or other facility;
> (c) Create an obstruction to other users of the OCS;
> (d) Are or become a lessee or the owner of operating rights of a lease on which there is a well that has not been permanently plugged according to this subpart, a platform, a lease term pipeline, or other facility, or an obstruction . . .

30 C.F.R. § 250.1702; *see also Total E&P*, 824 F. App'x at 205-06 (looking to the Federal Regulations to determine the time as of which decommissioning obligations accrue when the operating agreement is silent as to the same). Thus, Merit accrued decommissioning obligations upon becoming a Lessee of the South Pelto 8 and 13 Leases. These obligations remained post-assignment. The automatic amendment language does not alter this result,

as it is not a specific release of the decommissioning obligations.  Without language clearly and expressly relieving Merit of accrued obligations, this Court will not deviate from basic principles that, in Louisiana, assignment alone does not relieve an assignor of third-party obligations.  *See* La. Civ. Code art. 1821; *Chieftain Int'l*, 553 F.3d at 819; *LLOG Expl. Offshore*, 2016 WL 98618, at \*6-7; *Nippon Oil Expl. v. Murphy Expl. & Prod. Co.*, 2011 WL 2456358 at \*4 (E.D. La. Jun. 15, 2011); *see also Seagull Energy E&P*, 207 S.W. 3d at 345-47 (when contract provided that costs for abandonment would be shared according to owner's participating interest but contained no explicit release of obligations following assignment, found that the general rule applied and the assignor remained liable unless released by other parties to the contract) (Texas law).

None of the other sections of the Operating Agreement cited by Merit provide a release from the decommissioning obligations.  Specifically, Merit points to Articles XXVI and XV.  Neither article clearly and explicitly change the accrual and assessment of obligations as would be necessary to preclude Merit's liability.  *See Bradford*, 853 So. 2d at 767 (explaining that a release or discharge of the original obligor must be express).  Article XXVI does not release Merit from decommissioning obligations.  Article XXVI, in relevant part, states:

19

All or part of any Party's interest in the Joint Lease may be conveyed to a party or third party; however, because of the mutuality of interest required to successfully carry out the intent and purposes of this Agreement, any such conveyance to a party or third party must be approved by Parties representing 51.0% in interest hereunder, which approval cannot be unreasonably withheld. Before such conveyance shall become effective as to the other Parties, all payments due by the conveying Party under this Agreement to the Operator shall have been paid or settlement otherwise made. . . .[44]

This language pertains to costs assessed prior to assignment; it is silent as to costs assessed post-assignment for obligations that accrued pre-assignment. Accordingly, to read this as an express release of an assignor's obligations would be a step too far.

Finally, Article XV does not apply here. It states:

[N]o well which is producing or has once produced under the terms hereof shall be abandoned without the mutual consent of the Parties who own an interest in that well. If any of the Parties desire to abandon such well, it or they shall so notify the other Parties in writing and request their consent to the abandonment thereof. If such other Parties do not consent to the abandonment of said well, such other Parties shall take over such well and they shall pay to the other Party or Parties desiring to abandon same, in cash, the value of their respective interests in the salvage of the material and equipment in and on such well, less the estimated cost of salvaging same . . .

In the event of such transfer and assignment as herein provided, the Party or Parties so assigning after discharging its or their proportion of all obligations which have accrued hereunder up to the effective date of such assignment shall be relieved from any and all further liability under this agreement, insofar as said well is concerned; provided, however, that any such assignment shall neither affect nor change the participation of the Parties in and to the Oil and Gas produced from any other portion of the Joint Lease nor in the

---

[44]    R. Doc. 27-4 at 62-63, 149-50.

ownership in any other property and equipment owned hereunder by the Parties.[45]

The Article pertains to situations in which some parties desire to abandon a well that "is producing or has once produced."[46]   In short, it applies to situations in which some or all parties desire to abandon a well prior to the expiration of the Leases.  At issue here is abandonment obligations following termination of the Leases.

For the foregoing reasons, the Court finds that Merit accrued decommissioning obligations pre-assignment, and it has not been relieved of those obligations.  Accordingly, Merit remains obligated to contribute to decommissioning costs.

### 2. Breach

The Operating Agreements contemplate that expenses are to be shared.  Both Operating Agreements provide that "[n]o Party may refuse to pay . . . its share of the cost of . . . abandoning any well which is required to be drilled on the Joint Lease, or the cost of any other action or operation which may be ordered or required by the final order of an authorized representative of the United States."[47]   Merit argues that this provision is

---

[45]    R. Doc. 27-4 at 50, 140-41
[46]    *Id.*
[47]    R. Doc. 27-4 at 46-47, 138-39.

inapplicable because the subsection is titled "Wells Ordered by the United States."  The Operating Agreements plainly state that the headings used in the Operating Agreements are "for convenience only and shall be disregarded in construing" the Agreements.[48]  Merit's reliance on the header is therefore misplaced.

Moreover, the wells and platforms were required by the United States to be decommissioned within one year of the lease terminations.  30 C.F.R. §250.1710 ("You must permanently plug all wells on a lease within 1 year after the lease terminates."); 30 C.F.R. §250.1725 ("You must remove all platforms and other facilities within 1 year after the lease . . .").  The decommissioning costs here fall within the purview of Article XIV(F) of the Operating Agreements.  Accordingly, by not paying its share, Merit is in breach of the Operating Agreements.

*3. Damages*

ANKOR has provided, and Merit has pointed to no summary judgment evidence disputing, that the breach has resulted in financial damage.  Accordingly, the final requirement for a breach of contract claim is met.

---

[48]    R. Doc. 27-4 at 64, 154.

### 4. Privity

Merit argues that there is no "direct privity" between it and plaintiffs, and therefore ANKOR's breach of contract claim fails.  Merit cites only one case in support of this argument.  The case, *Quality Environmental Processes, Inc. v. Energy Development Corp.*, does not stand for the position Merit asserts.  835 So. 2d 642 (La. Ct. App. 1 Cir. 2002).  *Quality Environmental* involved a dispute over royalties under an onshore mineral lease, not a dispute over whether an Operating Agreement released an assignor of obligations concerning an offshore oil and gas lease.  *Id.*  And, the issue before Louisiana's First Circuit Court of Appeal in *Quality Environmental* was whether plaintiffs' claim for unpaid royalties was prescribed.  *See id.*  That court did not announce a requirement for direct privity of parties to enforce decommissioning obligations under oil and gas lease operating agreements.

Moreover, such a requirement would run contrary to the holdings of other courts.  For example, in *Nippon*, the Eastern District of Louisiana found that the defendant remained liable to plaintiff, which had become operator of the lease years after defendant assigned its interest, for its share of decommissioning expenses.  *Nippon*, 2011 WL 2456358, at *1.  As in *Nippon*, the question of whether obligations remain here turns on the terms

of the operating agreements, not whether the disputing parties held leasehold interests at the same time.

### 5. *Prescription of the Breach of Contract Claim*

Merit additionally argues that ANKOR's claims are prescribed because ANKOR began to accrue decommissioning expenses in May of 2014, and Black Elk defaulted on its obligation to pay at that time.[49]  ANKOR argues that Merit's start date for determining prescription is incorrect.[50]  ANKOR argues that the start date is actually 30 days after Merit received the bills for decommissioning expenses.[51]

In Louisiana, the prescriptive period for a personal action, such as an action for breach of a contract, is ten years.  La. Civ. Code art. 3499.  The prescriptive period begins to run on the date that the cause of action arose. *Corbello v. Iowa Prod.*, 850 So. 2d 686, 705 (La. 2003).  Here, the cause of action is breach of contract.  Per the contracts, non-Operators were required to pay their "proportion of all other bills within thirty (30) days after receipt."[52]  ANKOR issued a bill to Merit on July 11, 2022.  Assuming

---

[49]    R. Doc. 38 at 12.

[50]    R. Doc. 42 at 6.

[51]    *Id.*

[52]    R. Doc. 32-6 at 75, 32-7 at 66.

24

*arguendo*,[53] that Merit received the bill the same day, Merit was in breach of the contracts on August 10, 2022. ANKOR filed this suit in 2024, less than ten years after the cause of action arose. Therefore, ANKOR's breach of contract claim against Merit is not prescribed.

### 6. *Waiver and Equitable Estoppel*

Merit next argues that actions ANKOR took in attempting to recover from Northstar and Black Elk constitute waiver and/or provide a basis for equitably estopping ANKOR from pursuing Merit for the decommissioning expenses. On summary judgment, a defendant relying upon affirmative defenses "must establish beyond peradventure all of the essential elements" of the affirmative defense. *Access Mediquip L.L.C. v. UnitedHealthcare Ins. Co.*, 662 F.3d 376, 378 (5th Cir. 2011). A plaintiff is not required to "negate each element of an affirmative defense to succeed at the summary judgment stage." *Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 117 F.4th 628, 643 (5th Cir. 2024) (internal citation omitted). Here, as to both waiver and equitable estoppel, Merit fails to meet that bar.

---

[53] In Merit's July 19, 2022, email to ANKOR, Merit's representative Mr. Hagge acknowledged receipt of the ANKOR bill. The specific date between July 11 and 19 is unimportant because any of those days is certainly less than 10-years from the date at which ANKOR filed suit.

"Waiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *Steptore v. Masco Const. Co.*, 643 So. 2d 1213, 1216 (La. 1994). The party claiming waiver must establish reliable proof of waiver. *FDIC v. Duffy*, 47 F.3d 146, 150 (5th Cir. 1995) (citing *Tate v. Charles Aquillard Ins. & Real Est., Inc.*, 508 So. 2d 1371, 1375 (La. 1987)).

Merit argues that ANKOR's pursuit of Black Elk and Northstar for the decommissioning expenses for multiple years before seeking payment from Merit constitutes waiver.[54] Merit additionally argues that ANKOR's pursuit, and ultimate release, of Black Elk and Northstar impaired Merit's ability to protect its own rights.[55] ANKOR argues that its prior failed attempts to recover from Black Elk and Northstar were consistent with its right to pursue any solidary obligor for the debt.[56] ANKOR further argues that this conduct is not "so inconsistent with the intent to enforce" its rights as to induce a reasonable belief it had waived them.[57] ANKOR is correct. Pursuing one obligor for a debt is not "so inconsistent" with the intent to pursue another

---

[54]    R. Doc. 38 at 13-14.
[55]    *Id.*
[56]    R. Doc. 43 at 4.
[57]    *Id.*

26

obligor for the very same debt, that it should induce a reasonable belief that the obligee had waived that right.  *Cf. Amsouth Bank v. Sessions*, 34 So. 3d 342, 344 (La. Ct. App. 5 Cir. 2010) ("Unless the obligation is extinguished, an obligee may institute action against any of his solidary obligors even after institution of action against another solidary obligor.").  Merit has failed to provide any evidence showing that ANKOR intentionally relinquished its right against Merit or that it acted so inconsistently with the intent to enforce its right against Merit that it indeed relinquished that right.  *See Steptore*, 643 So. 2d at 1216.  Therefore, Merit's defense must fail.

The doctrine of equitable estoppel is designed to prevent injustice by barring a party from taking a position contrary to its prior acts, admissions, representations, or silence.  *Bellsouth Advert. & Pub. Corp. v. Gassenberger*, 565 So. 2d 1093, 1095 (La. Ct. App. 4 Cir. 1990).  The elements of equitable estoppel are: (1) representation by words or conduct; (2) justifiable reliance; and (3) a change in position to one's detriment because of such reliance. *Wilkinson v. Wilkinson*, 323 So. 2d 120, 126 (La. 1975).  Estoppel is not favored.

Merit relies upon the same actions by ANKOR for its estoppel argument as it does for waiver.  As with waiver, Merit has not put forth summary judgment evidence of a representation by ANKOR that it would not

27

pursue Merit for decommissioning costs.  Nor has Merit put forth summary judgment evidence of how Merit "justifiably relied" on any such statement.  Because Merit has failed to offer such evidence, Merit's defense must fail.

### 7. *Substantial Breach by ANKOR*

Finally, Merit next argues that ANKOR cannot recover for breach of contract because ANKOR itself breached the contracts.[58]  Here too Merit's arguments lack merit.  Merit has confounded rights with obligations.  Upon assignment of its lease interests, Merit's rights under the Operating Agreements were extinguished.  *Lusher*, 384 So. 2d at 591; Restatement (Second) of Contracts § 317 (1981).  Thus, ANKOR was not required to submit Authority for Expenditures to Merit as outlined by Article V, seek or obtain Merit's approval for decommissioning AFEs, consult with Merit on matters, or provide monthly billing to Merit, as Merit claims.  These are all rights provided in the Operating Agreements, not obligations.  Those rights were held by Merit's assignees, not by Merit.

Moreover, for a breach by one party to justify the non-performance of the other, it must be substantial.  See *LAD Servs. Of La., L.L.C. v. Superior Derrick Servs., L.L.C.*, 167 So. 3d 746, 755-56 (La. Ct. App. 1 Cir. 2014) (explaining that "not every breach excuses the other party from the

---

[58]    R. Doc. 38 at 17-20.

contract"). "A breach is substantial if it is an actual cause of the other party's 'failure to comply with its obligations.'" *Alonso v. Westcoast Corp.*, 920 F.3d 878, 884 (5th Cir. 2019) (quoting *LAD Servs.*, 167 So. 3d at 756-57). Merit has provided no summary judgment evidence that if only it had received monthly AFE and billing statements it would have paid its portion of the decommissioning expenses. Merit's argument that ANKOR first substantially breached the Operating Agreements is therefore unsupported and does not provide a bar to ANKOR's own breach of contract claim.

***

Accordingly, because there is no genuine dispute of material fact as to the satisfaction of all elements of the breach of contract claim, and defendants have not produced summary judgment evidence on each element on any affirmative defenses, the Court grants summary judgment for plaintiffs and denies summary judgment for defendants on this claim.

## B. Subrogation, Contribution, and Unjust Enrichment Claims

It is not necessary to reach ANKOR's claims for subrogation, contribution, and unjust enrichment because the Court's conclusion that plaintiffs prevail on the breach of contract claim justifies the same relief to plaintiffs.

29

## C. Quantum of Decommissioning Expenses Owed

ANKOR seeks a finding that the statements ANKOR issued to Merit setting forth Merit's share of decommissioning expenses are correct and establish the amount owed by each Merit entity.[59] ANKOR points out that the Operating Agreements provide two-years from the end of the calendar year the bill was sent to make any objections, and that Merit made no such objections.[60] Therefore, ANKOR argues, the amounts allotted to each Merit entity should be deemed "true and correct."[61]

In support, ANKOR submits a declaration, along with supporting documentation, that ANKOR sent written notice to Merit of Merit's share of the decommissioning expenses.[62] The declaration also states that Merit never filed a written exception to the expenses identified and that the 24-month period for Merit to contest the expenses has expired.[63] ANKOR additionally submits the COPAS Accounting Procedure of the Operating Agreements, which supports ANKOR's assertion that Merit had 24-months

---

[59]    *See generally* R. Doc. 35.
[60]    *Id.*
[61]    *Id.*
[62]    R. Doc. 35-5 at ¶¶ 13-15; R. Doc. 35-8; R. Doc. 35-9.
[63]    R. Doc. 35-5 at ¶ 19.

to take written exception to the statements of expenses before they would conclusively be presumed true and correct.[64]

ANKOR has satisfied its burden on summary judgment here.  Exhibit A to the Operating Agreements state:

> [A]ll bills and statements rendered to Non-Operators by Operator during any calendar year shall conclusively be presumed to be true and correct after twenty-four (24) months following the end of any such calendar year, unless within the said twenty-four (24) month period a Non-Operator takes written exception thereto and makes claim on Operator for adjustment.[65]

And ANKOR submits correspondence supporting its uncontested series of events related to the Statements.  Specifically, ANKOR issued the bills to Merit on July 11, 2022.[66]  Merit received the bills no later than July 19, 2022.[67]  Merit therefore had until December 31, 2024, to properly challenge the expenses.  Although Merit initially sought to audit the charges,[68] Merit abandoned the audit and never submitted a written exception.  The time to properly challenge the Statements has thus passed, and the Statements are now deemed "true and correct."

---

[64]    R. Doc. 35-6 at 75; R. Doc. 35-7 at 66.
[65]    R. Doc. 35-6 at 75; R. Doc. 35-7 at 66.
[66]    R. Doc. 35-9.
[67]    R. Doc. 35-10.
[68]    *Id.*

Merit does not address ANKOR's showing that the Statements are now "true and correct"; instead, Merit filed the same response to both motions for partial summary judgment.[69]  Merit makes no attempt to dispute that (1) ANKOR issued the Statements to Merit on July 11, 2022; (2) Merit received the Statements; (3) Merit never "[took] written exception" to the Statements or made a "claim on [ANKOR] for adjustment" before the end of the two-year allotted period to do so; or (4) per the Operating Agreements, Merit had two years from the end of 2022 to challenge the Statements before they "shall conclusively be presumed to be true and correct."[70]

Accordingly, the Court grants plaintiffs' motion for partial summary judgment as to the quantum of decommissioning expenses owed.  Each defendant's share of expenses is correctly set forth in the Statements as follows: $2,869,405.06 attributable to Merit Management Partners; $76,314.35 attributable to Merit Energy Partners III, L.P.; and $106,839.71 attributable to Merit Energy Partners D-III, L.P.

---

[69] *Compare* R. Doc. 39 *with* R. Doc. 38.
[70] R. Doc. 35-6 at 75; R. Doc. 35-7 at 66.

## IV.  CONCLUSION

For the foregoing reasons the Court GRANTS IN PART plaintiffs' partial motions for summary judgment and DENIES defendants' motion for summary judgment.

The Court GRANTS IN PART and DENIES IN PART plaintiffs' partial motion for summary judgment on liability.  Plaintiffs' motion is granted as to the breach of contract claim.  Because the Court need not reach plaintiffs' claims for subrogation, contribution, and unjust enrichment, the Court DISMISSES those claims WITHOUT PREJUDICE.

The Court GRANTS plaintiffs' partial motion for summary judgment on quantum of decommissioning expenses.

The Court DENIES defendants' motion for summary judgment.

New Orleans, Louisiana, this 21st day of November, 2025.

_Sarah Vance_
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE