UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ANKOR ENERGY, LLC ET AL.                    CIVIL ACTION

VERSUS                                              NO. 24-1953

MERIT MANAGEMENT PARTNERS                SECTION "R" (3)
I, L.P. ET AL.

## ORDER AND REASONS

This Court ordered plaintiffs ANKOR Energy LLC ("ANKOR") and
ANKOR E&P Holdings Corporations ("AEPH") to brief: (1) whether
plaintiffs' claim for "lease operating expenses" was properly before the Court;
and (2) why plaintiffs are entitled to such expenses.[1]  Before the Court is the
parties' responsive briefs.  Plaintiffs move for partial summary judgment on
the lease operating expenses.[2]  Defendants Merit Management Partners I,
L.P.; Merit Energy Partners III, L.P.; and Merit Energy Partners D-III, L.P.
(collectively, "Merit") oppose plaintiffs' motion and move for partial
summary judgment in defendants' favor.[3]  For the reasons that follow, the
Court grants plaintiffs' motion for partial summary judgment and denies
defendants' cross-motion for partial summary judgment.

---

[1]     R. Doc. 52.
[2]     R. Doc. 53.
[3]     R. Doc. 58.

## I.    BACKGROUND

The Court has reviewed the record and determines the undisputed facts are as follows.[4]  This dispute arises out of the operations of two federal offshore oil and gas leases: South Pelto 8 (OCS F03587) and South Pelto 13 (OCS G03171).  The operations on the South Pelto 8 lease were conducted under the Operating Agreement Block 8, South Pelto Area Offshore Louisiana, dated August 1, 1977 (the "PL 8 OA").[5]  The operations on the South Pelto 13 lease were conducted under the Operating Agreement Block 13, South Pelto Area Offshore Louisiana, dated July 1, 1975 (the "PL 13 OA").[6]

Merit previously owned working interest in the South Pelto 8 and 13 leases.[7]  Merit acquired record title and operating rights interests in the leases in 2002 and assigned its interests in the leases to Black Elk effective on January 1, 2011.[8]  AEPH acquired interests in the leases on October 1,

---

[4]    *See* R. Doc. 47 for a full recounting of the undisputed facts.
[5]    R. Doc. 47 at 2; R. Doc. 53-1 at ¶ 4; R. Doc. 58-3 at ¶ 2.
[6]    R. Doc. 47 at 2; R. Doc. 53-1 at ¶ 4; R. Doc. 58-3 at ¶ 3.
[7]    R. Doc. 47 at 2-3; R. Doc. 1; R. Doc. 58-3 at ¶ 5.
[8]    R. Doc. 47 at 2-3; R. Doc. 1; R. Doc. 58-3 at ¶¶ 5-6.  Black Elk later assigned its interests in the leases to Northstar, effective as of December 31, 2014.  R. Doc. 1 at ¶ 6; R. Doc. 58-3 at ¶ 7.

2011.[9]  And ANKOR became the operator of the leases in 2012.[10]  The leases terminated in 2018.[11]

During ANKOR's time as operator of the leases, it incurred day-to-day expenses (i.e., "lease operating expenses").  These expenses are the crux of the present motions.  Specifically disputed is whether plaintiffs properly brought a claim for lease operating expenses, and, if they did, whether plaintiffs are entitled to compensation from Merit for such expenses.  The Court considers the motions below.

## II.    LEGAL STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam).  "When assessing whether a dispute to any material fact exists, [the Court] consider[s] all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence."  *Delta & Pine Land Co. v. Nationwide Agribusiness Ins.*, 530 F.3d 395, 398-99 (5th Cir. 2008) (citing *Reeves v. Sanderson*

---

[9]      R. Doc. 47 at 3.
[10]     R. Doc. 53-1 at ¶ 6; R. Doc. 58-3 at ¶ 8.
[11]     R. Doc. 53-1 at ¶ 12; R. Doc. 58-3 at ¶ 38.

3

*Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  All reasonable inferences are drawn in favor of the nonmoving party, but "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."  *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) (quoting 10A Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2738 (2d ed. 1983)); *see also Little*, 37 F.3d at 1075 (noting that the moving party's "burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence" (citations omitted)).  "No genuine dispute of fact exists if the record taken as a whole could not lead a rational trier of fact to find for the non-moving party."  *EEOC v. Simbaki, Ltd.*, 767 F.3d 475, 481 (5th Cir. 2014).

If the dispositive issue is one on which the moving party will bear the burden of proof at trial, the moving party must put forth material admissible in evidence or capable of being made admissible that would "entitle it to a [judgment as a matter of law] if the evidence went uncontroverted at trial." *Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1264-65 (5th Cir. 1991) (quoting *Golden Rule Ins. v. Lease*, 755 F. Supp. 948, 951 (D. Colo. 1991)

4

(internal quotation marks omitted)). "[T]he nonmoving party can defeat the motion" by either countering with material admissible in evidence or capable of being made admissible sufficient to demonstrate the "existence of a genuine dispute of material fact," or by "showing that the moving party's evidence is so sheer that it may not persuade the reasonable fact-finder to return a verdict in favor of the moving party." *Id.* at 1265.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that the evidence in the record is insufficient with respect to an essential element of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. The burden then shifts to the nonmoving party, who must, by submitting or referring to material admissible in evidence or capable of being made admissible, set out specific facts showing that a genuine issue exists. *See id.* at 324; Fed. R. Civ. P. 56(c)(1)(A), (c)(2)(B). The nonmovant may not rest upon the pleadings but must identify specific facts that establish a genuine issue for resolution. *See, e.g., id.*; *Little*, 37 F.3d at 1075 ("Rule 56 'mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial.'" (quoting *Celotex*, 477 U.S. at 322)).

At this stage, an affirmative defense will defeat summary judgment for plaintiff "if the defendant supports each element of the defense with summary judgment evidence." *Occidental Petroleum Corp. v. Wells Fargo Bank, N.A.*, 117 F.4th 628, 643 (5th Cir. 2024). The burden of proof is on the party pleading the affirmative defense. *See id.*

## III.   DISCUSSION

### A. Claim Properly Before the Court

Federal Rule of Civil Procedure 8 sets forth a liberal pleading standard. Rule 8 requires merely that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" Fed. R. Civ. P. 8(a)(1). Moreover, the Rule provides that "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). The complaint "must provide the defendant with fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (cleaned up); *see also Campana v. Eller*, 755 F.2d 212, 215 (5th Cir. 1985) ("[I]t of course is axiomatic that a defendant is entitled to know the nature and extent of the claim being made against him.") (citing *United States v. Classified Parking Sys., Inc.*, 213 F.2d 631, 633 (5th Cir. 1954)).

Here the complaint regularly refers to expenses to "operate and decommission" the leases.[12] The most liberal reading of plaintiffs' complaint provides a basis for a claim for decommissioning expenses and for lease operating expenses. As this Court's previous summary judgment order addressed only the former, plaintiffs' claim regarding the latter remains.

## B. Breach of Contract

The two South Pelto leases underlying this dispute are located on the Outer Continental Shelf off the coast of Louisiana. Under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. § 1331, *et seq.*, the Court applies the law of the state that is adjacent to the area of the Outer Continental Shelf upon which the leases are located, 43 U.S.C. § 1333(a)(1)-(2). Louisiana law applies here.

Under Louisiana law, the "essential elements of a breach of contract claim are the existence of a contract, the party's breach thereof, and resulting damages." *Carollo v. Tulane Univ.*, 414 So. 3d 610, 616 (La. App. 4 Cir. 2025) (quoting *1100 South Jefferson Davis Parkway, LLC v. Williams*, 165 So. 3d 1211, 1216 (La. App. 4 Cir. 2015)). At issue here is whether Merit is in breach

---

[12]    *See* R. Doc. 1 at ¶¶ 3, 20; *see also* R. Doc. 1 at ¶ 22 ("all costs associated with operations on the Leases, including costs related to decommissioning").

of the Operating Agreements by virtue of not having paid lease operating expenses ANKOR incurred after Merit exited the leases.

The Operating Agreements for South Pelto 8 and South Pelto 13 control.  The relevant provisions, which are the same[13] in both agreements, are as follows:

Article IV—

Except as hereinafter provided, all costs and expenses incurred hereunder shall be shared, all equipment installed on the Joint Lease shall be owned, and all Oil and Gas produced and saved hereunder shall be owned by the Parties in the following percentages:

[Original Parties to the Agreement and Percentage Interests Listed]

Each Party shall have a "Voting Interest" equal to its Percentage Interest as shown above.   Should the Percentage Interest change at any time this Article IV shall automatically be amended to reflect such change.  Except as otherwise provided herein, all matters shall be decided by an affirmative vote of at least three (3) Parties jointly owning at least 51% Voting Interest; provided, however, that amendment of the Agreement shall require mutual consent of the Parties.[14]

Article V—

Except as hereinafter provided, Operator shall advance, pay and discharge all costs and expenses incurred hereunder and

---

[13] The original parties and associated percentage interests, omitted from the recitation of the Article, are not the same.

[14] R. Doc. 27-4 at 5-6, 98-99.

shall charge each of the Parties the same percentage thereof as said Party's Percentage Interest stated in Article IV.[15]

Article XXVI —

All or part of any Party's interest in the Joint Lease may be conveyed to a party or third party; however, because of the mutuality of interest required to successfully carry out the intent and purposes of this Agreement, any such conveyance to a party or third party must be approved by Parties representing 51.0% in interest hereunder, which approval cannot be unreasonably withheld.  Before such conveyance shall become effective as to the other Parties, all payments due by the conveying Party under this Agreement to the Operator shall have been paid or settlement otherwise made. . . .[16]

Louisiana law is clear that mere assignment is insufficient to release the assignor from obligations it owes to a third party.  La. Civ. Code art. 1821; *see also Chieftain Int'l (U.S.) Inc. v. Southeast Offshore, Inc.*, 553 F.3d 817, 819 (5th Cir. 2008).  Louisiana Civil Code Article 1821 provides:

An obligor and a third person may agree to an assumption by the latter of an obligation of the former.  To be enforceable by the oblige against the third person, the agreement must be made in writing.

The obligee's consent to the agreement does not effect a release of the obligor.

The unreleased obligor remains solidarily bound with the third person.

---

[15]    R. Doc. 27-4 at 6, 99.

[16]    R. Doc. 27-4 at 62-63, 149-150.

9

Obligations are not extinguished unless "expressly done so by the oblige." *Bradford v. Onshore Pipeline Const. Co., Inc.*, 853 So. 2d 756, 767 (La. App. 2d Cir. 2003) (defendant "is not relieved from its obligations under the gas purchase contract with [p]laintiffs just because it made an assignment to [a third party]").

The pertinent question is whether the Operating Agreements themselves contain explicit language that operates as a release of the obligation to contribute to costs and expenses. The Court finds that these provisions do not contain the explicit language necessary to release former leaseholders from the obligations of the Operating Agreements.

This Court previously held that these provisions did not operate to release Merit from decommissioning obligations.[17]  Merit seeks to distinguish operating expenses from decommissioning expenses. This distinction is inapt and lacks support in the case law. Both *Chieftan* and *Seagull* drew no distinction between abandonment and other operational costs.

In *Chieftain*, the Fifth Circuit affirmed the lower court's holding that "Southeast [the assignor] remain[ed] solidarily liable to Hunt [the lease operator] for the *operating expenses* of Southeast's assignee." *Chieftain*

---

[17]  *See* R. Doc. 47.

*Int'l*, 553 F.3d at 818 (emphasis added).  There, the Fifth Circuit noted that Southeast stopped paying expenses before it assigned its interest to South Pass Properties, which then "did not pay any bills associated with the joint operations on the leases either before or after the assignment." *Id.*  Further, Hunt did not propose abandonment of the leases until "[a]pproximately six months after the assignment." *Id.*  The costs associated with abandonment were therefore one of the costs Southeast's assignee failed to pay, but not the only cost.  There was no distinction drawn regarding the types of operating expenses in the conclusion that Southeast remained solidarily liable to Hunt.

Similarly, in *Seagull* the Texas Supreme Court found that "despite selling its working interest, the seller remain[ed] liable under the operating agreement, unless released by the operator or the terms of the agreement." *Seagull Energy E&P, Inc. v. Eland Energy, Inc.*, 207 S.W. 3d 342, 344 (Tex. 2006).  The case arose after Nor-Tex, Eland's assignee, "failed to reimburse Seagull for its share of *operating costs.*" *Id.* (emphasis added).  Seagull then looked to Eland for payment of these "operating costs." *Id.*  After reviewing the operating agreement, the Texas Supreme Court found that it was insufficient to terminate Eland's obligations to contribute to the operating costs under it.  *Id.* at 346-47.

Here, the Operating Agreements obligated leaseholders to pay for "costs and expenses incurred" under the Operating Agreements.[18]  Lease operating expenses are "costs and expenses."  As with decommissioning expenses, upon entering the leases Merit acquired the obligation to pay lease operating expenses.  Merit has pointed to no express release.  The provisions provided above do not contain clear and express language relieving Merit of its obligation to contribute to costs and expenses, including lease operating expenses, incurred under the Operating Agreements post-assignment.

This Court already held that Articles IV and V did not contain an express release, even considering the "shall automatically be amended" language.[19]  And Article XXVI, which requires an assignor to pay at the time of assignment all "payments due," says nothing to release the assignor from future liability under the leases even though the Operating Agreements contain an express release in a different context.    Article XV, on abandonment of individual wells, provides for an express release of liabilities.  The article provides:

> [N]o well which is producing or has once produced under the terms hereof shall be abandoned without the mutual consent of the Parties who own an interest in that well.  If any of the Parties desire to abandon such well, it or they shall so notify the other Parties in writing and request their consent to the

---

[18]    *See* R. Doc. 27-4 at 5; 96.
[19]    *See* R. Doc. 47 at 15-17.

12

abandonment thereof.  If such other Parties do not consent to the abandonment of said well, such other Parties shall take over such well and they shall pay to the other Party or Parties desiring to abandon same, in cash, the value of their respective interests in the salvage of the material and equipment in and on such well, less the estimates cost of salvaging same . . .

In the event of such transfer and assignment as herein provided, the Party or Parties so assigning after discharging its or their proportion of all obligations which have accrued hereunder up to the effective date of such assignment ***shall be relieved from any and all further liability*** under this Agreement, insofar as such well is concerned; provided, however, that any such assignment shall neither affect nor change the participation of the Parties in and to the Oil and Gas produced from any other portion of the Joint Lease nor in the ownership in any other property and equipment owned hereunder by the Parties.[20]

The Operating Agreements' inclusion of express release language elsewhere undermines the argument that the provisions which do apply and are silent as to obligations post-assignment, should constitute a release.

Further, the record is devoid of any agreement separate from the Operating Agreements in which the Operator affirmatively released Merit from any liabilities post-assignment.  Because Merit has not shown that it was released, Merit remains solidarily liable to plaintiffs.  *See* La. Civ. Code art. 1821; *Chieftain Int'l*, 553 F.3d at 819-820; *Ciolino v. First Guar. Bank*, 133 So. 3d 686, 692 (La. App. 1 Cir. 2013) (finding that the "divestiture of []

---

[20]    R. Doc. 35-6 at 50-51 (emphasis added).

13

rights did not terminate [] obligations under [a] lease absent an express release from the lessors").

The Court now turns to damages.   Plaintiffs have provided an accounting of the monies owed (i.e., damages).  Merit has not contested the accuracy of the accounting.  Instead, Merit argues that because plaintiffs recouped the lease operating expenses from other operators, plaintiffs have suffered no damages.  This ignores the Operating Agreements themselves, which allowed the Operator to look to the remaining Non-Operators to cover a delinquent Non-Operator's share of expenses.[21]  The same provisions also state that, should the Operator recover from the delinquent Non-Operator, the Operator shall distribute the payment to the Non-Operators that contributed to cover the expense.[22]  Accordingly, plaintiffs are not trying to double-dip.  Plaintiffs are following the terms of the Operating Agreements and must, upon receipt of payment from Merit, distribute the money to Non-Operators that previously contributed to cover the expense.

### C. Waiver

"Waiver occurs when there is an existing right, a knowledge of its existence and an actual intention to relinquish it or conduct so inconsistent

---

[21]     *See* R. Doc. 27-4 at 10-11, 102-103.
[22]     *See id.*

with the intent to enforce the right as to induce a reasonable belief that it has been relinquished." *Steptore v. Masco Const. Co.*, 643 So. 2d 1213, 1216 (La. 1994). The party claiming waiver must establish reliable proof of waiver. *FDIC v. Duffy*, 47 F.3d 146, 150 (5th Cir. 1995) (citing *Tate v. Charles Aquillard Ins. & Real Est., Inc.*, 508 So. 2d 1371, 1375 (La. 1987)).

Merit relies upon a July 11, 2022 letter from ANKOR CFO Myoung Joon Kim for support.[23] Specifically, Merit relies on the statement "[a] spreadsheet summarizing all charges due from Merit is enclosed herewith" and the related spreadsheet which includes only decommissioning expenses.[24] This ignores the context of the letter, the subject of which is "Decommissioning Invoice." The same paragraph containing the "all charges due" language states that ANKOR completed the decommissioning operations and that Merit is obligated to pay for its share of those costs.[25] It is clear this letter was focused only on decommissioning expenses. A reasonable party would not have read this letter as relinquishing the right to recover non-decommissioning expenses owed. Defendants' waiver argument fails.

---

[23]    *See* R. Docs. 58-2 at 18-20, 58-5.
[24]    *Id.*
[25]    *See id.* at 1.

15

### D. Substantial Breach by Defendants

As previously explained, upon Merit's assignment of its lease interests, Merit's rights under the Operating Agreements were extinguished.[26] Defendants were under no obligation to send Merit monthly bills for the lease operating expenses. Merit has therefore pointed to no breach by defendants.

### E. "Industry Practice"

Defendants argue that it is not "industry practice" to charge a former working interest owner for lease operating expenses incurred after the date of assignment. Regardless of whether this is the case, "industry practice" does not nullify the law. And the law is clear that assignment alone does not relieve the assignor of obligations owed to a third-party. These are sophisticated parties. They should have been aware of the law and, to the extent the default rule ran contrary to "industry practice," they could and should have contracted as necessary to address this.

### F. Accounting

Plaintiffs submitted a declaration, along with supporting documentation, to support plaintiffs' calculation that defendants owe

---

[26]    *See* R. Doc. 47 at 28. (citing *Lusher v. Kilcrease*, 384 So. 2d 589, 591, (La. App. 4 Cir. 1980); Restatement (Second) of Contracts § 317 (1981)).

$1,493,418.29 in unpaid lease operating expenses.[27]   Defendants do not address this accounting, let alone provide any documentation that would call into question the accuracy of the calculations.  Finding plaintiffs' submitted evidence of the calculation sufficient, the Court accepts it as correct. Defendants' unpaid lease operating expenses amount to $1,493,418.29.

## IV.   CONCLUSION

For the foregoing reasons the Court GRANTS plaintiffs' partial motion for summary judgment and DENIES defendants' cross-partial motion for summary judgment.

Within ten days of this order, plaintiffs shall file a proposed final judgment, including any request for interest and costs.  Defendants shall have seven days to file any response.  Plaintiffs' reply, if any, shall be filed within seven days thereafter.  The Court will then enter final judgment.

New Orleans, Louisiana, this __30th__ day of April, 2026.

_____
SARAH S. VANCE
UNITED STATES DISTRICT JUDGE

---

[27]   *See* R. Docs. 53-4, 53-5, 53-6, 53-7.

17